THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ASSOCIATION FOR ACCESSIBLE MEDICINES, )<br>)<br>*Plaintiff,* )<br>v. )<br>)<br>KWAME RAOUL, in his official capacity )<br>as Attorney General of the State of Illinois, )<br>)<br>*Defendant*. ) | No. 24 C 544<br><br>Chief Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Association for Accessible Medicines ("AAM"), seeks to enjoin the Illinois Attorney General's enforcement of House Bill 3957 ("the Act") against its members based on out-of-state transactions claiming the Act violates the dormant Commerce Clause's prohibition against extraterritorial state legislation. (Dkt. 51). For the below reasons, the Court denies AAM's Motion for Preliminary Injunction [51].

## BACKGROUND

AAM is the leading trade association representing generic and biosimilar drug manufacturers and distributors. (Dkt. 35 ¶ 14). Several states—Illinois included—have passed laws regulating the price of generics and biosimilars. These measures have largely been responsive to skyrocketing drug prices, sometimes by more than 1,000%, and sometimes overnight. (*See* Dkt. 58 at 6). The Illinois legislature's solution is to regulate the "wholesale acquisition cost" of certain generic and biosimilar products that are eventually sold in-state. (*Id.* at 7). Specifically, the Act—which took effect on January 1, 2024—prohibits manufacturers and wholesale drug distributors from "engag[ing] in price gouging." 410 Ill. Comp. Stat. 725/10(a). The Act defines price gouging as:

1

> [A]n unconscionable increase in a prescription drug's price that: (1) would result in the wholesale acquisition cost of a 30-day supply of the essential off-patent or generic drug exceeding $20 and would result in an increase in the wholesale acquisition cost of the essential off-patent or generic drug of: (A) 30% or more within the preceding year; (B) 50% or more within the preceding 3 years; or (C) 75% or more within the preceding 5 years; and (2) is otherwise excessive and unduly burdens consumers because of the importance of the essential off-patent or generic drug to their health and because of insufficient competition in the marketplace.

*Id.* § 5. Excluded from the definition are "reasonably justified" price hikes stemming from increased production costs or costs incurred to expand access to a specific drug. *Id.* The Act directs the Attorney General to investigate possible instances of price gouging and further provides that Illinois courts may order generic manufacturers to cease sales that violate the Act, disgorge money acquired because of a price increase that violates the Act, and pay a civil penalty of up to $10,000 per day for each violation of the Act. *See id.* § 10(c)(2), (3), (5).

In regulating the wholesale acquisition cost of these drugs, Illinois targets upstream sales rather than direct sales to Illinois consumers. This is largely a function of how the U.S. prescription drug industry is structured. Drug manufacturers rarely sell their products directly to patients; indeed, they rarely even sell to pharmacies. (Dkt. 52 at 3). Instead, manufacturers ordinarily "sell nationally, to wholesale distributors, who resell to pharmacies, who in turn resell to patients." (Dkt. 52 at 3). The price of that first sale, from manufacturer to distributor, is the wholesale acquisition cost and "serves as a benchmark for the price of a specific drug." (Dkt. 58 at 2).

Three companies control over 90% of the wholesale distribution market, and none of them are based in Illinois. (Dkt. 52 at 3). So, when an out-of-state generic manufacturer sells product X to a wholesale drug distributor, that transaction will almost always involve two non-resident entities and occur entirely outside of Illinois. But if the wholesaler sells product X to a pharmacy that, in turn, sells product X in Illinois, the Act can be enforced against the manufacturer based on

the price of the initial sale. *See* 410 Ill. Comp. Stat. 725/10(c) ("[A] manufacturer or wholesale drug distributor who is alleged to have violated this Act may not assert as a defense that the manufacturer or wholesale drug distributor did not directly sell a product to a consumer residing in Illinois.").

AAM claims the Act violates the dormant Commerce Clause, the Due Process Clause of the Fourteenth Amendment, and the Constitution's horizontal separation of powers. (Dkt. 35 ¶¶ 78–108). The Court granted the Attorney General's first Motion to Dismiss because AAM failed to allege facts sufficient to confer standing and likewise failed to allege a credible threat of prosecution. (Dkt. 32). The Court subsequently found that AAM's First Amended Complaint cured these deficiencies. (Dkt. 46). While AAM's Complaint alleges six independent causes of action, the throughline is whether the Constitution permits Illinois to regulate the prices of wholly out-of-state sales. (Dkt. 46 at 5).

Now, in its renewed Motion for Preliminary Injunction, AAM asks the Court to enjoin the Act based on Count One of its Complaint, which alleges the Act violates the dormant Commerce Clause's prohibition against extraterritorial state legislation. (*See* Dkt. 52 at 8; Dkt. 62 at 2). Touching on the remaining Counts in its Complaint, AAM suggests that other parts of the Constitution prohibit "direct state regulation of out-of-state transactions." (Dkt. 52 at 8 n.15). But AAM does not advance any of those separate theories in its Motion for Preliminary Injunction—they are thus surrendered for the purposes of this motion. *See Cassell v. Snyders*, 990 F.3d 539, 551 (7th Cir. 2021)*; see also Halgren v. City of Naperville*, 577 F. Supp. 3d 700, 726–27 (N.D. Ill. 2021).

**DISCUSSION**

"A preliminary injunction is 'an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.' " *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023) (quoting *Cassell*, 990 F.3d at 544). To obtain a preliminary injunction, the moving party must show that (1) it is reasonably likely to succeed on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm absent an injunction. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). If the moving party establishes these threshold requirements, the Court will balance the equities, "weighing the harm to the moving party if the requested injunction is denied against the harm to the nonmoving party and the public—including third parties—if it is granted." *Finch*, 82 F.4th at 578; *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Likelihood of success on the merits is often the decisive factor. *Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022).

## I. Likelihood of Success on the Merits

AAM contends Illinois's direct regulation of out-of-state commerce is plainly unconstitutional under the dormant Commerce Clause.

Congress has the power to "regulate Commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. But the Commerce Clause has long been understood to include a negative command, one that prohibits states from passing laws that "unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019). The dormant Commerce Clause's existence is uncontroversial; its boundaries are not.

Two primary dormant Commerce Clause strands "guide the courts in adjudicating cases challenging state laws[.]" *South Dakota v. Wayfair*, 585 U.S. 162, 173 (2018). First, state laws may not "discriminate against interstate commerce." *Id.* Second, state laws may not "impose undue

4

burdens on interstate commerce." *Id.* The "antidiscrimination principle lies at the 'very core' of . . . dormant Commerce Clause jurisprudence." *Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 369 (2023) (quoting *Camps/Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997)). It serves to ward off state laws and regulations that are designed to "benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Rev. of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74 (1988)). Laws that impose burdens on interstate commerce without facially discriminating against it, on the other hand, are subject to a more flexible test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Under *Pike,* a facially neutral state law that serves a legitimate local interest may nonetheless violate the dormant Commerce Clause if the burden it imposes on out-of-state commerce is "clearly excessive in relation to the putative local benefit." *Id.* at 142. AAM does not invoke either principle in its Motion for Preliminary Injunction. Instead, it argues the Act is unconstitutional under a third dormant Commerce Clause precept, one that prohibits "state laws that directly regulate out-of-state commerce." (Dkt. 52 at 13).

Courts have referred to this third dormant Commerce Clause strand as the "extraterritoriality principle." *See, e.g.*, *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1172 (10th Cir. 2015) (Gorsuch, J.) (referring to the "extraterritoriality principle" as the "least understood" and "most dormant" strand of commerce clause jurisprudence). It was featured most recently in a Supreme Court case involving a California law that prohibited the in-state sale of pork products if they came from pigs that were cruelly confined. *Ross*, 598 U.S. at 365–66. Out-of-state pork producers advanced an "almost *per se* rule forbidding enforcement of state laws that have the practical effect of controlling commerce outside the State, even when those laws do not purposely discriminate against out-of-state economic interests." *Id.* at 371 (citation modified). The

5

Court unanimously rejected this "practical effects" argument and eventually upheld the California law regardless of its out-of-state consequences.[1] *Id.* at 371–76. This case, however, presents an inverse of *Ross*. Where the California law in *Ross* regulated in-state commerce based on upstream conduct, the Act regulates upstream commerce based on downstream effects. Accordingly, AAM contends the Act is unconstitutional before and after *Ross*—at least to the extent it applies to wholly out-of-state sales between non-residents of Illinois. (Dkt. 52 at 13–14). This basic premise has some force. Indeed, the *Ross* majority was careful not to "trivialize the role territory and sovereign boundaries play in our federal system" and emphasized the need for courts to "referee disputes about where one State's authority ends and another's begins." *Ross*, 598 U.S. at 378. But AAM's reliance on dormant Commerce Clause extraterritoriality presents several complex issues.

One key to AAM's argument is the Supreme Court's plurality opinion in *Edgar v. MITE Corp.*, 457 U.S. 624 (1982). There, four justices signed onto the proposition that the dormant Commerce Clause prohibits a state from directly regulating transactions that take place "wholly outside the State." *Edgar*, 457 U.S. at 641–43. The *Ross* majority stopped short of recognizing this theory as a continuing strand of dormant Commerce Clause jurisprudence. Instead it elided *Edgar* considering the California law only targeted in-state sales. *See Ross*, 598 U.S. at 376 n.1. But the majority simultaneously noted that commentators have questioned whether the state law at issue in *Edgar* "posed a dormant Commerce Clause question as much as one testing the territorial limits of state authority under the Constitution's horizontal separation of powers." *Id.* In other words, *Ross* does not squarely address whether the dormant Commerce Clause itself prohibits a state from regulating out-of-state transactions based on their downstream consequences. *See* Bradley W. Joondeph, *The "Horizontal Separation of Powers" After* National Pork Producers Council v. Ross,

---

[1] The more fractured portion of the Court's decision in *Ross* focused on the continuing viability, force, and scope of *Pike* balancing, but that analysis is irrelevant to the extraterritoriality challenge AAM raises in this case.

61 San Diego L. Rev. 45, 78–79 (2024) (noting *Ross* "glided past" issues concerning "the substantive content of the Constitution's prohibition on extraterritorial state legislation").

While *Ross* did not answer the precise question this case presents, it offered a robust discussion on three cases that have long been linked to the extraterritoriality principle. Those cases—*Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935); *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth*, 476 U.S. 573 (1986); and *Healy v. Beer Instit.*, 491 U.S. 324 (1989)—all involved state price control or price affirmation laws that the Court held violated the dormant Commerce Clause. *Baldwin* struck down a New York price control law barring out-of-state producers from selling milk in New York unless they charged the minimum price guaranteed to in-state producers. *See Baldwin*, 294 U.S. at 519–22. *Brown-Forman* and *Healy* involved laws that required out-of-state distillers and brewers to affirm their in-state prices were no higher than out-of-state prices. *See Brown-Forman*, 476 U.S. at 576–78; *Healy*, 491 U.S. at 326–29. The pork producers in *Ross* relied on language from all three opinions that suggested, in isolation, the Court decided the *Baldwin–Healy* cases on the grounds that the state laws they addressed impermissibly controlled commerce occurring wholly beyond each state's boundaries. *Ross*, 598 U.S. at 373. But the *Ross* Court unanimously agreed that the petitioners' "read too much into too little" from the *Baldwin–Healy* cases. *Ross*, 598 U.S. at 373. Instead, the Court clarified that these cases did not prohibit extraterritorial legislation writ large, but only legislation with a "*specific* impermissible extraterritorial effect" tracing directly back to the antidiscrimination principle. *Id.* at 374. Indeed, a closer examination of the cases reveals three laws that were plainly designed either to protect an in-state industry (*Baldwin*) or to hoard commerce for in-state merchants (*Brown-Forman* and *Healy*). *See id.* at 372–73.

The problem this poses for AAM is that the Act does not discriminate on out-of-state interests. It regulates the price of drugs sold in Illinois, without regard for where they are manufactured. (Dkt. 58 at 11). And the Act in no way favors Illinois corporations or manufacturers, or discourages consumers from engaging with merchants across state lines. Without a protectionist tilt, the *Baldwin–Healy* cases are of virtually no use to AAM in its attack on the Act under the dormant Commerce Clause. As far as Supreme Court cases go, that leaves AAM to rely entirely on the *Edgar* plurality—and perhaps the footnote in *Ross* discussing it—for the proposition that the dormant Commerce Clause prohibits nondiscriminatory state laws that directly regulate out-of-state commerce. Against this murky backdrop, AAM contends that two Seventh Circuit cases relying on the extraterritoriality principle control the outcome.

Read in a vacuum, the Seventh Circuit's decisions in *Legato Vapors v. Cook*, 847 F.3d 825 (7th Cir. 2017) and *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010), certainly support AAM's position. In *Legato Vapors*, the court struck down an Indiana law that imposed significant regulatory burdens on out-of-state e-cigarette liquid manufacturers and distributors. *Legato Vapors*, 847 F.3d 827–28. The court reasoned the law was unconstitutional for the sole reason that it governed transactions that "occur[ed] entirely outside the regulating state." *Id.* at 836. This was so despite "obvious concerns about [the law's] protectionist purposes." *Id.* at 833. The court declined to rest its decision on the antidiscrimination principle because, in its view, the law was clearly unconstitutional extraterritorial legislation. *Id. Legato Vapors* followed *Midwest Title*, which struck down another Indiana law that regulated out-of-state title companies making loans to Indiana residents. *Midwest Title*, 593 F.3d at 664–68. There again, the court found the state statute ran afoul of the dormant Commerce Clause, not because of any discriminatory

purpose, but because Indiana was attempting to directly "regulate activities in other states." *Id.* at 665.

Before *Ross*, *Legato Vapors* and *Midwest Title* would probably control this Court's likelihood of success on the merits analysis. But both cases heavily relied on *Baldwin* and its progeny to support one major legal proposition: that, protectionism aside, the dormant Commerce Clause prohibits the direct regulation of wholly out-of-state commerce. *See Legato Vapors*, 847 F.3d at 829–30; *Midwest Title*, 593 F.3d at 665–66. After *Ross*, this conception of the *Baldwin–Healy* cases is no longer accurate, and casts doubt the court's conclusions in both cases.

Nonetheless, AAM points to a handful of nearly identical state laws that courts have struck down both pre- and post-*Ross* as violating the dormant Commerce Clause. *See, e.g.*, *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664 (4th Cir. 2018); *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957 (8th Cir. 2025); *Ass'n for Accessible Meds. v. Bonta*, 766 F. Supp. 3d 1020 (E.D. Cal. 2025). The Court has carefully considered these out-of-circuit cases and finds their reasoning unpersuasive. By way of example, the Eighth Circuit's decision in *Ellison* upheld an injunction on a similar Minnesota law regulating generic drug pricing. *Ellison*, 140 F.4th at 961. It reasoned that, under *Ross*, *Baldwin*, and *Healy*, the Minnesota law had the "specific impermissible extraterritorial effect of controlling the price of wholly out-of-state transactions" and that, under these circumstances, no showing of discrimination or protectionism was required. *Id.* at 961. This is a misreading of *Ross*. *See N.J. Staffing Alliance v. Fais*, 110 F.4th 201, 207 (3d Cir. 2024) ("[T]he dormant Commerce Clause does not prohibit laws solely because they have extraterritorial reach absent protectionist intent or effect."); *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 951 (9th Cir. 2013) (finding *Healy* and *Baldwin* only applicable to protectionist price control and price affirmation statutes). The "specific impermissible

9

extraterritorial effect" *Ross* observed of the state laws at issue in the *Baldwin–Healy* cases was that each "deliberately prevented out-of-state firms from undertaking competitive pricing or deprived businesses and consumers in other States of whatever competitive advantages they may possess." *Ross*, 598 U.S. at 374 (quoting *Healy*, 491 U.S. at 338–39) (citation modified). In other words, they were discriminatory and protectionist. Thus, the *Ellison* court's conclusion that the Minnesota law was unconstitutional simply because it impacted the price of out-of-state transactions again "reads too much" into the *Baldwin–Healy* cases. *Id.* at 373.

Judge Wynn's dissent from the Fourth Circuit's pre-*Ross* majority opinion in *Frosh* is further illustrative of this point. The majority in *Frosh* struck down a materially similar Maryland law regulating generic drug prices and, in doing so, read *Baldwin* and *Healy* broadly to stand for the proposition that "the extraterritoriality principle is violated" whenever a state law regulates the price of an out-of-state transaction. *Frosh*, 887 F.3d at 670. This is the very reading of the *Baldwin–Healy* cases that the Supreme Court rejected in *Ross*. Anticipating that decision, Judge Wynn noted in dissent that the *Baldwin–Healy* cases could not be reduced to forbidding the regulation of out-of-state transactions, but rather turned on "the principle concerns animating the Supreme Court's dormant Commerce Clause jurisprudence: economic protectionism, discrimination against interstate commerce, and State regulation of a stream of transactions that never crosses through the State's borders." *Id.* at 684 (Wynn, J., dissenting). Like *Legato Vapors* and *Midwest Title*, *Frosh* was decided based on a conception of the dormant Commerce Clause that the Supreme Court has now rejected.

One final question demands an answer: does the *Edgar* plurality alone provide enough support for AAM's position? There are several reasons why this Court believes the answer is "no." First, the language in *Edgar* on which AAM relies did not "draw support from a majority of the

10

Court," and the Seventh Circuit has declined to follow it, even in in situations where "th[e] language, if controlling, would mean victory" for the plaintiff. *See Alliant Energy Corp. v. Bie*, 330 F.3d 904, 916 (7th Cir. 2003);[2] *see also CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 81 (1987) ("As the plurality opinion in *MITE* did not represent the views of a majority of the Court, we are not bound by its reasoning."). Second, this Court disagrees with AAM's suggestion that *Ross* somehow endorsed or preserved the extraterritoriality principle as conceptualized in *Edgar*. To the contrary, the lone footnote in *Ross* discussing *Edgar* distinguished the cases on their facts and went on to cast doubt on whether the state law in *Edgar* posed a dormant Commerce Clause issue at all, or if it instead implicated horizontal separation of powers more broadly. *Ross*, 598 U.S. at 376 n.1. This view of *Edgar* and the extraterritoriality principle has long been percolating among scholars studying the penumbra surrounding the dormant Commerce Clause. *See* Donald H. Regan, *Siamese Essays: (I)* CTS Corp. v. Dynamics Corp. of America *and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation*, 85 Mich. L. Rev. 1865, 1884–97, 1904 (1987); Joondeph, *supra*, at 49, 62–70. Finally, the modern Supreme Court cases discussing the dormant Commerce Clause frame the inquiry as a two-principle approach. Plaintiffs can either challenge a state law because it (1) "discriminate[s] against interstate commerce" or (2) "impose[s] an undue burden on interstate commerce" and flunks *Pike* balancing. *Wayfair*, 585 U.S. at 173; *see also Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 160 (2023) (Alito, J., concurring in part and concurring in the judgment) ("Under our modern framework, a state law may offend the Commerce Clause's negative restrictions in two circumstances: when the law discriminates against

---

[2] The Seventh Circuit's opinion upon rehearing in *Bie* does not increase AAM's likelihood of success on the merits. If anything, that opinion reinforces this Court's conclusion that, after *Ross*, the appropriate analysis for any dormant Commerce Clause case involves only two theories: the antidiscrimination principle and *Pike* balancing. *See Alliant Energy Corp. v. Bie*, 336 F.3d 545, 547 (7th Cir. 2003) (concluding a "two-tiered test" applies to all dormant Commerce Clause challenges, including challenges to extraterritorial regulations).

11

interstate commerce or when it imposes 'undue burdens' on interstate commerce."). The Supreme Court's omission of extraterritoriality from the discussion severely undercuts the doctrine's continuing viability.

While the Court is not persuaded by AAM's extraterritoriality argument under the dormant Commerce Clause, the Act may well be unconstitutional for some other reason. For example, it may fail *Pike* balancing, violate the Due Process Clause, or run afoul of horizontal separation of powers. *See Frosh*, 887 F.3d at 681 (Wynn, J., dissenting) (noting the "the availability of potentially more appropriate constitutional provisions, like the Due Process Clause, to ensure that States do not unduly extend their regulatory authority beyond their borders"). AAM raises these arguments in separate counts of its Complaint, but did not present them in support of its Motion for Preliminary Injunction. Thus, they will have to be addressed on another day. *Cf. Epel*, 793 F.3d at 1172 ("[W]hether Colorado's law survives the *Pike* or *Philadelphia* tests may be interesting questions, but they are ones that will have to await resolution[.]").

In summary, the Court finds that that AAM has failed to make a "strong showing" of its likelihood of success on the merits. *Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1188 (7th Cir. 2023) (citation modified). This alone counsels against the entry of a preliminary injunction. *See Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (noting likelihood of success on the merits is "often decisive," eliminating the need to address the remaining elements). Nonetheless, the Court addresses the remaining preliminary injunction factors briefly below.

## II.     Irreparable Harm

In its Order denying the Attorney General's second motion to dismiss, this Court addressed many of the relevant facts pertaining to the harm AAM and its members face. (*See* Dkt. 46 at 3– 4). At this stage, AAM must show that harm is "irreparable"—i.e., "legal remedies are inadequate

to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). AAM offers two theories on irreparable harm: (1) the existence of a "continuing constitutional violation" and (2) unrecoverable economic losses. (Dkt. 52 at 16–17). Having failed to advance a theory that persuasively demonstrates the Act's constitutional infirmity, AAM's first theory is insufficient to establish irreparable harm. AAM has, however, demonstrated more than a mere possibility of irreparable economic harm.

Rodney Emerson, the Vice President of Pricing and Contracts for Sandoz, Inc. ("Sandoz"), one of AAM's members, submitted a declaration describing the company's decision to forego specific drug price increases it had planned for calendar year 2024 because of the "significant penalties and other monetary liability" it could face under the Act. (*See* Dkt. 54 ¶¶ 15–17). This foregone revenue, Emerson avers, presents a real risk to Sandoz's business and could force the company to withdraw certain "generic or biosimilar products it currently sells nationwide." (*Id.* ¶ 29). Sandoz attributes its previously planned price increases for one of its products to a variety of factors, some tied to increased production costs and expanding access to the drug, and others driven by "overall profit margins . . . and provid[ing] a greater return on investment for [Sandoz] shareholders." (*Id.* ¶ 18). AAM's members have further demonstrated that they face a credible threat of prosecution based on the existence of the Act alone. (*See* Dkt. 46 at 3–4); *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012) ("The existence of the statute constitutes the government's commitment to prosecute in accordance with it and, thus, a concrete prospect of future harm for one who would flout it.").

The Court harbors some skepticism about the true scope of harm AAM's members face considering the Act excludes from the definition of price gouging "reasonably justified" price increases tied to "an increase in the cost of producing the essential off-patent or generic drug" or

13

"appropriate expansion of access" to the drug. 410 Ill. Comp. Stat. 725/5. While Emerson suggests that there are several factors relevant to Sandoz's price increases that fall outside of these categories, AAM has not offered any legal argument as to why, for example, "regulatory approval costs" or "inflation" would not be excludable production costs. (Dkt. 54 ¶ 18). Nonetheless, there are certain categories of price increases that certainly do fall outside these categories—like driving shareholder value. In any event, the money AAM's members are losing right now by way of foregone price increases represent real business losses that must be taken into consideration. And while economic losses alone are ordinarily insufficient to demonstrate irreparable harm, they may be enough to justify injunctive relief when a post-merits damage remedy would be inadequate. *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994). That is the case here, because AAM's members will not be able to recover economic losses sustained during the pendency of this litigation if they eventually prevail on the merits due to sovereign immunity. *See Staffing Servs. Ass'n of Illinois v. Flanagan*, 720 F. Supp. 3d 627, 641 (N.D. Ill. 2024).

Considering the costs of complying with the Act, the possible penalties for violating the Act, and detrimental business positions AAM's members have already taken in response to the Act, coupled with sovereign immunity, the Court finds that AAM has carried its burden in establishing irreparable harm.

### III. Balance of the Equities

Finally, the Court considers the balance of the equities and public interest. Since AAM's likelihood of success on the merits is low, the balance of harms must weigh decisively in its favor to justify preliminary relief. *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018). It does not. *See NetChoice, LLC v. Fitch*, 2025 WL 2350189, at *1 (U.S. Aug. 14, 2025) (Kavanaugh,

14

J., concurring) (explaining a plaintiff must "sufficiently demonstrate[] that the balance of harms and equities favor it" in justifying interim relief, even if it has shown a likelihood that the state law at issue is unconstitutional).

AAM's members face real harm because of the Act. It will undoubtedly burden their bottom lines, may force them to make challenging business decision, and could result in significant unrecoverable penalties. But it should go without saying that a state law's impact on corporate profits alone will never be enough to enjoin that law. This is especially true when compared to the Attorney General's strong interest in enforcing a statute that was duly enacted by the representatives of the people of Illinois. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). Thus, absent a colorable constitutional violation, the balance of harms favors the Attorney General. Both parties make compelling arguments on the competing public interest considerations. Ballooning drug prices are a significant concern for Illinoisans of all stripes, but especially for the most vulnerable among us. The Attorney General has emphasized the public's interest in having affordable access to generic and biosimilar drugs and argues the Act is specifically designed to protect that access. (*See* Dkt. 58 at 7–9). AAM posits the Act is harmful to the interest it is ostensibly designed to protect because it may force generic manufacturers out of the market all together and "exacerbate the drug-shortage problem." (Dkt. 52 at 20). At best for AAM, the public interest considerations are a wash at this early stage of the litigation. And a wash is not enough considering AAM's low

15

likelihood of success on the merits, the competing harms, and the extraordinary form of relief AAM seeks.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction [51] is denied.

                                                              Virginia M. Kendall
                                                             United States District Judge

Date: September 26, 2025